We've set this matter for Monday afternoon. This is Hechinger Investment Company versus Fleet Retail. Mr. Schuch. Thank you, Your Honor. Howard Schuch from Casual Expensive Investment Company versus Fleet Retail. Thank you, Your Honor. Mr. Friedman. Mr. Friedman had a conflict. We put it on Monday to accommodate Mr. Friedman. Yes. I know David. David had another conflict, and that's why. I apologize, Your Honor. We could have put it back on Thursday then. He's going to be out of the country later. You're the one that does. You don't have a problem with Thursday, do you? No. If he had a conflict, then maybe it would have been better had, I don't know about my colleagues, but it would have been certainly better for me if you had this back on Thursday. We were trying to accommodate you. I apologize, Your Honor. All right. Good. We'll give you a minute back on this. That's all right. In the Third Circuit's decision in Moody v. Security Pacific, this Court declared that failed leveraged buyouts merit close scrutiny under the Fraud and Evasion Lawsuit. I think we got a problem with the prior case and the valuation that Judge Robinson came to, which he claimed it was fair market valuation, and what the Third Circuit did afterwards, in and found it manifestly correct. Tell us why we're not bound here. In the prior case for the equitable lien, Judge Robinson felt that it was inappropriate in a case for an equitable lien, it would be unfair, it would be inequitable in that situation, to rely upon an objective retrospective valuation of the company as evidence of its fair market value. But what our court said was that if you take a look at paragraphs 17, 21, and 30 of Judge Robinson's decision, first thing is they held that as a matter of law, she made a finding of fact as to valuation. And they said, here's the standards for what a finding of fact is. And then secondly, having made that finding of fact, they found that it was not clearly erroneous that the value of Boulder Square was $260 million versus $10 million. Rather than saying collateral estoppelment, it almost seems that this Court, having said as a matter of law, that's a finding of fact, and that it's not clearly erroneous. Why isn't that in effect the case for us? We can't overturn what our prior panel did. Absolutely not, but I would submit, Your Honor, that it's not law of the case because an item can have a different value in a different case. Items can have different values for different purposes. But if Boulder Square was $260, and you had to be in that case more than $153 in order not to violate the 92 indenture, $153 ipso facto is more than $127, right? Correct. If this Court determines that the valuation in the other case is binding and preclusive, then that's the end of the inquiry. But I would respectfully submit that based upon the Third Circuit's decision in Amarato-Hess and the Supreme Court's decision in Consolidated Brock v. Dubois, that items can have different values for different purposes, and that the value What is the different value? What's the different purpose here? I'm missing. The value Boulder Square is either going to be $260 or not $260 as a finding of fact, correct? That's correct. But the valuation that the methodology that Judge Robinson adopted that was affirmed by this Court in the prior case was a purchase accounting valuation, a book valuation, which the Court determined was adequate to add evidence of the fair market value in that case for purposes of the equitable need analysis. But this Court has previously said on multiple occasions that the fair market value was rather But what your person did, he valued the company as a standalone, Boulder Square, where should not have valued it as a merged entity? He did both. He valued it on a standalone basis. Where did he take in the 1,200 or so pages, where did he take into account the synergies that came from the merger? In the sections of his report, I believe it's tabs. If you can point those out to me. Tab 43 of his report. The values Heckinger and Builder Square. That's appendix what? I apologize. I don't have the exact page numbers with me. At appendix 6615, there's a table of contents for Dr. Shickhead's report. And on page 6618, I just have the reference to the table of contents. I can get the reference I'm not sure this is what you're referring to. There is a summary at A1359. I'm not sure that's what you're referring to. Didn't the opinion actually say it was the net fair market value of $260 million? Aren't those the exact words of the opinion and the law and order action? Those are the words of the opinion. But for purposes of reasonably equivalent value analysis, there is room for other evidence of value. And I think Judge Robinson recognized that in her decision when she said, it's a two-step process that I need to follow under this court's precedent. First, I need to decide if there has been any value received. And then I need to apply the totality of the circumstances test. And when she applied the first part of the analysis, she said, I'm finding that at least $10 million was received, if not the contested $260 million. And then she went on to find that there were synergies and there was a credit line and then there was the $260 million prior valuation. So Judge Robinson herself, we believe, acknowledged that there are different valuation methodologies that needed to be applied in the different cases, one for purposes of the equitable analysis and one for purposes of an objective retrospective valuation of Builder Square. And to see what Builder Square was worth to Hechinger, not what Builder Square was worth by itself, not what a factory full of TVs is worth, $5 million on its own. But what does that $5 million of TVs worth to Hechinger? But what is worth to Hechinger includes certain synergies and the court noted at least four of them. And I don't, where in the Dr. Shakin, I'll get the exact pages for you when I get it. Might it be 2509 before we start? 2509. This is, this is one place. There's a prior place in his, in his report as well where he discusses the combined value of the companies after the merger. And what does he, maybe when you sit down, you can let me know where he does it in the summary, because I didn't find it. Where he does it in the summary? Yeah. Discounts or doesn't take into account the synergies or for a particular reason, says he's not, or does take into account the synergies and comes up with a lesser number. Well, what he does is on page 2514, he, he sets forth the assumptions that Leonard Breen used in valuing the company. In other words, he took the company's assumptions for the post merger valuation of the company. And he says exactly how he adopted those. But the two-day trial was on the prior case that was before us, was it not? Yes. And Dr. Shaked testified at that trial? Yes, he did. Did he present this report? He presented half the report. This report is Hackington and Builder Square. The other part was simply Builder Square. And so if he presented a significant portion of the report and the judge made a decision to go with the 260 of the other side, wouldn't it be a waste of Judge Robinson's time to send this back to have her consider the same thing again that she's already rejected? I mean, if it's the same person with the same analysis and essentially the same report, why would we want to ask her to go back and look at it again? Because in the other case, the judge said that Dr. Shaked's analysis was adequate to create an issue of fact as to the value of Builder Square as between the parties to the indenture itself. But what she said was she found that after trial that it wasn't 10 million, it was 260. So at that point, she had heard it and she came down on the other side. And we affirmed. That's correct. And we said, and the argument you made, or I guess Mr. Ross made at that point, was that in that case, she really didn't make findings of fact. And that was a plausible argument, but this court held differently that in fact, she did make findings of fact and having made them, they were not clearly erroneous. So we're sort of back where we started. We are, but I would respectfully submit that Judge Robinson in this case did not dismiss, did not grant summary judgment on the grounds that she had issued a prior preclusive finding or that this court had made a determination that throughout the case, that was not the basis. Don't we have a right to look at the record and make a determination independently as to whether or not the collateral stopper applies, notwithstanding what Judge Robinson did? The court has the power, although this court's precedence would suggest that the normal practice would be to allow the district court to make findings with respect to collateral stop on the first instance. Good. Mr. Shoup, thank you very much. Have you back on rebuttal? Good afternoon. Elizabeth Greyer from Cravath, Swain & Moore on behalf of Appellee Chase. If I could just pick up and respond to a couple of the questions and responses that were given by Mr. Shoup with respect to collateral estoppel. I think that the trust in its papers says that the issue in this case is what is the fair market value of Builders Square. Put a different way, if the fair market value of Builders Square is more than the $127 million that they're trying to get from the defendants, then there was reasonably equivalent value and there is no claim for constructive fraudulent conveyance. There are different ways under different circumstances of valuing different items of have said that the proper valuation for the assets of Builders Square that came into this combination as part of the transactions in 1997 is a fair market value analysis. I think that the record from the bondholder case, both the district judge's opinion and this court's affirmance of that opinion make it perfectly clear that the analysis that was in the related bondholder case was a fair market value analysis. In fact, those words are used in the opinion below of Judge Robinson and in this court's opinion, you find, you set forth the definition of what it is to do a fair market valuation and you find that she did do one and that it was manifestly correct. So I really don't think that there is any issue at all, but that that finding is either binds them either by collateral estoppel or law of the case or something, but there is no reason to send this back to Judge Robinson to have the same finding made between the same parties with the same evidence, with the same expert and the like. In their brief and today at the podium, plaintiffs have tried to distinguish that by saying that it was a purchase accounting valuation and that's a book valuation. With all respect, that simply one doesn't follow from the other. There is absolutely no support in the record, in the case law or in any accounting understanding of purchase accounting valuation that would suggest that it's something that's a book valuation and not a fair market value. In fact, the words used by Judge Robinson and by this court to describe that very valuation technique was fair market value. She used those words and this court used those words and a purchase accounting valuation involves marking assets and liabilities to fair market value. So this notion that somehow this is nothing more than a book value and there's a different value. Did book value appear anywhere in the prior cases? Not as far as I'm aware. It's in none of the opinions and I don't believe, I mean if someone may have used the record, the trial transcript of the bondholder case, all of which is in the record here, but we went back and looked at what she relied on for her finding and they were not talking about book value. I guess there's some argument that fair market value and reasonably equivalent value under 548 has some distinction in meaning, but I don't think it makes any practical difference here. I don't think it does either. And just one point of clarification because I think this has gotten just a little bit confused in all of our briefing and that is this is not technically a 548 case because the company survived for well more than a year after the transactions at issue. It's actually brought under 544. Yeah, exactly. But whether or not one could conceive of a difference between purchase accounting and I think here it's perfectly clear that that is not what happened. What happened here was the question in the bondholder trial was were the assets that the combined entity received, the builder square assets, were they worth, were they valued, should they be valued at more than I think it was 153 was the number there. And she found that contemporaneous valuations that were fair market, purchase accounting gap valuations that were audited found that this was worth 260 and that she thought that she should rely on those contemporaneous valuations and this court affirmed that. Also finding that it was a fair market value and that that funding of hers was manifested correct. They have not pointed to any different type of valuation that should be done in this case or anything that was wrong, if you will, with that valuation. And they suggest that she somehow walked away from it by not making her entire ruling on collateral estoppel. A couple comments. If you look through the timing of all of these cases, while summary judgment was being briefed, the bondholder case was on appeal. And in fact, if you go through the when the decision from this court came down, they moved on bond hearing. All of her decisions were made before the bondholder case was final. So I can't speak to what was in Judge Robinson's mind, of course, but it is not crazy to assume that part of what may have going on was her showing deference to the appellate process in the other case and essentially doing belt and suspenders. She does say in her opinion, granting summary judgment in this case, when she lists all of the value that came in to Hechinger as a consequence of these transactions, she goes through a list of things and she talks about the synergies, the expense synergies, the combination synergies. She talks about the line of credit being valuable, but she also says, and I found that builder square was valued at 260 and that came in. So she does acknowledge that finding and she lists it among all of the reasons she thinks that summary judgment is warranted based on what happened in the past. So she doesn't walk away from that. She just doesn't say fully collateral estoppel. In some ways it's belts and suspender. It's the, I think what she's, you know, one could say that what she's trying to say is even if it's not technically collateral estoppel, which we would argue it absolutely is, based on the record before me now, if I had to make this decision, I would find that there's no genuine issue of material fact that the property that came in or the assets that came in as a result of this series of transactions didn't equal at least $127 million. And I think that there is ample support for that in the record. I think collateral estoppel should end the inquiry. She found and you affirmed that the fair market value was $168 million. But even if you don't go there for the reasons said in our brief, there's nothing to suggest that whatever came in wasn't worth at least $127 million. In my last couple of seconds, let me just point out Chase's role in all of this. They are trying to recover $127 million from Chase. Chase got $9.8 million in fees and there's no suggestion that those fees were improper. There's no suggestion that Chase didn't act in good faith. Indeed, the intentional fraudulent conveyance claim summary judgment was granted on and that's not on appeal. You briefed that well. Yep. Thank you. Good. Thank you very much. Mr. Wren? Good afternoon, Your Honor. I am representing the Leonard Green parties and they were the LBO sponsors. This has been called an LBO, although we don't really think it was an LBO. But in any event, we were the equity sponsors in all of this. Your argument on the aiding and abetting issue was that somehow there's collateral that should be applied here. But isn't what was talked about before have nothing to do with LGP and the Hechinger Board of Directors? No, it did have something to do with it. And the reason is because in the bondholder trial, the plaintiff in that case. Well, there the issue was that it violated a provision of the 92 indenture, right? Right. And so it came down to a question of evaluation. Whether or not... But were there any facts found relating to the relationship of LGP to the Hechinger Board? Yes. Well, in terms of the Hechinger Board, it came down to the issue of whether LGP... Look, they argued that this was a collapsed transaction, that this was an integrated transaction, that one step wouldn't have followed without the other. And that the parties negotiated and acted at arm's length. But their argument was that LGP had negotiated a $10 million purchase of the Builder Square assets. But I think their argument is that, yes, the court... Well, it said that there was an arm's length transaction. It didn't necessarily say it was an arm's length transaction as to whom, did it? This was an arm's length transaction. It was negotiated in good faith. But probably, my guess is, it does include the relationship with LGP to the Hechinger Board. But I couldn't see anything in Judge Robinson's opinion that really talks about that. Well, Your Honor, she does talk... In her summary judgment opinion, she does talk about the concept of collapsing. And she ultimately says that... In this case, it's been allowed to collapse. Yeah, in this case... For analysis purposes. For analysis purposes. And if you collapse the transaction... Basically, these parties were all negotiating with each other. It's nonsensical to think that somehow or another, LGP was acting at arm's length with regard to Builder Square, but was not acting at arm's length with regard to the Hechinger Board. Indeed, LGP negotiated the price down during the transaction. I mean, that's the pure definition of acting at arm's length. And my only point before was that they had put into play, in the bondholder trial, the valuation. They then argued, they've admitted in their pleadings that LGP negotiated at arm's length. They argued that also to Judge Robinson in oral argument. And we've also cited in our brief, a literal mountain of evidence to support our position that we, in fact, did negotiate and acted at arm's length. Mr. Wright, there's been a lot of discussion here of collateral estoppel today. Why isn't the fact that the district court denied the director's motion for summary judgment something that we should consider as a factor in looking at whether or not Red and Green partners aided and abetted a breach of fiduciary duty? Well, Your Honor, insofar as their motion for summary judgment was denied, it was denied, I think, because the board had an interest that was different than the general shareholder group. The interest, the parachute payments, or whatever you want to call them, the golden parachutes, all of those were existing obligations of the company. And we've cited, Your Honor, the Lukens case, which is directly on point on this, that when a purchaser comes along and pays the lawful obligations of the company, not that we did it, but the company did it, that that's not a knowing participation in a breach. From her aiding and abetting purposes, the mere fact that she may have found that there is a triable issue of fact on the breach of fiduciary duty itself doesn't require also that there's a triable issue of fact on whether we, as a third party, not receiving any of this, engage in a knowing participation. Isn't the only additional fact that you need is to determine whether or not you were aware and you were a participant and that you knew of what was going on? Isn't this question of fact, which apparently led the court not to grant summary judgment to the directors, isn't that similarly a question of fact on the aiding and abetting claim against your client? No, Your Honor, because she affirmed in the motion for summary judgment, in the summary judgment ruling, that we had in fact acted in arm's length. And as a result, that plus all of the evidence that supports that proved to her that no matter what that was, we weren't a knowing participant as the aiding and abetting case law requires with regard to whatever the individual shareholders might have received. She made that specific finding. Look, she was the judge in the first trial. She was the judge in this case as well. She knows what she considered and what she determined in that first trial. And there was no question in her mind that she had determined that LGP had acted at arm's length. And then she looked at Delaware Authority and came to the conclusion that yes, indeed, no matter what, even if there was the possibility of a breach by some of the director defendants, that didn't translate into a knowing participation by the equity sponsors. So you're saying that a finding of acting at arm's length is enough to refute the knowing participation? Yes, Your Honor. It's not just that. It's also the fact that the plaintiff had asserted on at least a couple of different occasions, including in his brief in opposition to the motion for summary judgment, that his case was based upon negligence. And there's a whole plethora of case law, which we've cited in our brief, that to the extent that the underlying breach was based upon negligence and not intentional misconduct, and this was their argument, that there can be no aiding and abetting that results from that. And if you'd like, Your Honor, I can give you the site to all of those cases, at least in our brief. We have that. I have that. Your Honor, my time is up. I did want to, if I could, just correct one statement that had been made by the plaintiff in this case. I don't know whether it'll ever make a difference, but they had alleged that LGP had an obligation to pay the shareholders. That's just simply not true. Look at the one page that they cite. For that, it's the merger agreement. LGP isn't even a party to that. They cite no evidence to support this. The party that was obligated was BSQ Acquisition. So, Your Honor, and that really went to our party for whose benefit. Thank you, Mr. Wray. Thank you. Mr. Hsu. Let me begin, if I may, just following up on the aiding and abetting breach of fiduciary duty point quickly. Let me ask you just at the outset on that. Where in the record is any document suggesting that LGP's relationship with the Hechinger board was not limited to an arm's length dealings? There's evidence, there's testimony that Leonard Green, the representatives personally met with John Hechinger and negotiated the transaction outside the board. Before the transaction was brought to the Hechinger board. Does that make it not arm's length or what? I mean, his job was to put a deal together, right? His job was to put a deal together. So he's got to meet with the responsible parties in order to do that. Let me answer your question somewhat differently. There's evidence that the parties of Leonard Green negotiated in good faith and at arm's length. There's also some evidence in the record that the negotiations were done primarily between Leonard Green and John Hechinger outside the rest of the board. And that in addition to trying to secure the best price that they could for themselves for the purchase of Hechinger stock, that Leonard Green and partners either created or exploited a conflict at the board of Hechinger. What was the conflict that they attempted to exploit? John Hechinger and his son and the other members of the board, the senior executives who secured Golden Parachute and other severance benefits for themselves at around the time that they met with Leonard Green and company, signed a lockup agreement with Leonard Green and company before the transaction was brought to the board. We submitted evidence that Leonard Green and partners exploited and or created a conflict at the board to get to lock up the transaction, bring it to the company. Under Delaware law, you've got to show that or produce evidence that LGP actively was involved with them in attempting to breach a board member's fiduciary duty. Where in the record is that? There's, there's, there's evidence throughout the record that Leonard Green and company structured, structured the transaction. Understand they structured this transaction, but where is there evidence in the record that they actively worked with the board or attempted to get the board to breach a board member's fiduciary duty to the corporation? The evidence is, is reflected, I believe, in some of Judge Robinson's findings in the prior case and, and, and it's only judgment. The only finding, I mean, Mr. Ray's saying the only findings in paragraph 30 where it says that this entire transaction was conducted at arm's length in good faith. Let's, let's assume that that's true. Let's assume that that's 100% true. Under Delaware law, under the, under the Malpeque case, that's how you pronounce it. The court says that you can have arm's length, good faith negotiations, but if you create or exploit a conflict at the board, if you can still knowingly assist and knowingly aid in the bed a violation of breach of fiduciary duty, if you know a party or you help cause a party to breach their fiduciary duty, the fact that you're trying to secure the best price for yourself and negotiate at, at, at arm's length doesn't mean that there aren't some other. That's right. I understand Malpeque, Chief Justice Veazey wrote that. What he was saying was that an arm's length transaction is, could still nonetheless be inconsistent with a level of knowing participation required for aiding and abetting liability. But you, you still got to produce the evidence that there was this collusion, if you will, to aid in the bet. Your Honor, I don't, I don't have the specific, other than what I've described for you, I don't have the specific facts. I have to rest on what we put in our reply brief in response to LGP's argument with respect to that. But I would note that Judge Robinson's decision is completely silent on the issue. She finds that, that arm's length negotiations are inconsistent with a claim for aiding and abetting breach of fiduciary duty. And on that basis, she dismissed the claim. She did not say that there was no knowing participation or aiding and abetting breach of fiduciary duty. She said, once you get to the first step in the process, there's no claim. And we just think that that's wrong, and that the claim should be remanded for further consideration of the evidence in the record with respect to that claim. With respect to the fair market value, I'd like to pick up on your point about whether there's a distinction between reasonably equivalent value and fair market value. And I think that there is one. Because I think that in assessing reasonably equivalent value, you have to look at what, at the benefit of an item, not its stand-alone value, but its value to the acquiring company. And Dr. Shekhead submitted a 1,200-page expert report. But the big thing to the company that ultimately came out, the merged company, which was attempting to try to deal with Lowe's and with Home Depot, I mean, the mother's milk, if you will, is credit. And they came out with a very significant amount of additional credit that they believe they needed. As it turned out, the business judgment didn't work out. The market wasn't favorable to them. But that's a huge get. But they continued for 20 months. They continued for 20 months. But at a time when your expert said that they couldn't, when I read the report, it seemed that they couldn't continue to go on. They were not a growing concern any longer. Well, the way Dr. Shekhead would explain it, I guess I'll end with this, is that, no analogy is perfect, but if you give somebody who's under the water two full tanks of gas, of air, but he needs five in order to survive, he'll be able to survive for a very long time. That doesn't mean that what you've done at the time to go under there with two tanks is legitimate and reasonable within the language of RML. And that this company hemorrhaged itself and cannibalized itself for about 14 months, and then got a refinancing with Fleet, and then still couldn't survive, and ultimately filed for bankruptcy. But his opinion is that combining two sick companies was never going to allow you to compete with Home Depot or Lowe's, because they were predatory, gigantic companies that previously killed Rickle, Handy Annie, Grossman's, Ernst Home Center, and that those companies spent themselves into bankruptcy by doing transactions like this, and that there was no way that you were going to get these two companies to turn themselves around. So what you're saying is today Delta and Northwest shouldn't merge this week? That one's a little bit beyond my capacity. Business decisions are made all the time. Sometimes they work, sometimes they don't. Understood. But there was an expert opinion that the district court said she was going to decline to absorb and analyze because she didn't like the way it was presented. That was her ultimate decision. She said, you don't present the evidence to me clearly and succinctly. I recognize that he has an opinion on this subject. I recognize that he's competent. He's a qualified expert. He submitted testimony in the prior case that the company was not worth what you're telling me. But I'm not going to read his opinion because I don't like the way you gave it to me. Thank you, Mr. Shute. Thank you, Your Honor. Thank all counsel. And we'll take the case under advisement.